### In re T.B. HOME SEWING ENTERPRISES, INC., Debtor.

### Richard D. ELLENBERG, as Trustee, Plaintiff,

### v.

### PLAID ENTERPRISES, INC., Defendant.

Bankruptcy No. A90–07184–SWC.
Adv. No. 92–6978.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Sept. 23, 1993.

Richard D. Ellenberg, Richard G. McBryan, Ellenberg & Associates, P.C., Atlanta, GA, for plaintiff.

Dan R. Musick, Norcross, GA, for defendant.

## ORDER

STACEY W. COTTON, Bankruptcy Judge.

Before the court are cross-motions for summary judgment. Plaintiff seeks to avoid and recover a preferential transfer in the amount of $57,098.77. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The court will grant defendant's motion and deny plaintiff's motion.

## FACTS

On May 25, 1990, T.B. Home Sewing Enterprises, Inc. ("debtor") filed for bankruptcy protection under Chapter 11. The case was converted to Chapter 7 on November 19, 1990, and plaintiff, Richard D. Ellenberg, was appointed as the Chapter 7 trustee. Prior to its Chapter 11 petition, debtor pur-

chased products on several occasions from defendant Plaid Enterprises, Inc.

During the preference period, debtor made four payments to defendant as follows: (1) check number 010400 in the sum of $63,799.72; (2) check number 011132 in the sum of $13,962.29; (3) check number 011414 in the sum of $171.36; and (4) check number 011293 in the sum of $729.83. Check number 010400, dated January 18, 1990, was applied to invoices with credit terms of 45 days as follows:

| INVOICE NUMBER | INVOICE DATE | INVOICE AMOUNT |
| --- | --- | --- |
| 326197 | 11/17/89 | $ 5,928.00 |
| 326417 | 11/20/89 | 13.35 |
| 327392 | 11/27/89 | 297.11 |
| 327828 | 11/29/89 | 309.56 |
| 328139 | 11/30/89 | 209.62 |
| 328238 | 11/30/89 | 34,036.14 |
| 328239 | 11/30/89 | 1,050.84 |
| 328240 | 11/30/89 | 21,955.10 |

Said check was honored by debtor's bank on February 28, 1990.

The four payments by debtor to defendant total $78,663.20. Plaintiff filed this adversary proceeding on November 19, 1992, to avoid and recover those payments as preferential transfers pursuant to 11 U.S.C. §§ 547(b) and 550(a). Defendant answered asserting that the payments totalling $78,663.20 are nonavoidable pursuant to the contemporaneous exchange exception, the ordinary course of business exception, and the subsequent new value exception. 11 U.S.C. § 547(c)(1), (2), and (4). Thereafter, the parties filed cross-motions for summary judgment. Plaintiff and defendant agree that check numbers 011132, 011414, and 011293 are excepted from avoidance thereby leaving check number 010400 as the only payment at issue. Plaintiff further concedes that pursuant to § 547(c)(4), defendant provided debtor with subsequent new value in the sum of $6,700.95. Thus, plaintiff contends in his motion for summary judgment that he is entitled to judgment in the amount of $57,098.77 plus statutory interest. Defendant, however, contends that the subject payment was made within the ordinary course of business pursuant to § 547(c)(2).

## DISCUSSION

Federal Rule of Civil Procedure 56, made applicable by Bankruptcy Rule 7056, provides for the granting of summary judgment if "... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it "... might affect the outcome of the suit under the governing (substantive) law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). A dispute of fact is genuine "... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the burden of establishing the right of summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982); *United States Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir.1975).

In determining whether there is a genuine issue of material fact, the court must view the evidence in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985); *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). The moving party must identify those evidentiary materials listed in Federal Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(e). Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion must go beyond the pleadings and demonstrate that there is a material issue of fact

794

which precludes summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Coats & Clark*, 929 F.2d at 608.

The court must determine whether the payment by check number 010400 can be avoided as a preference. Five elements of a preference under § 547(b)[1] must be proven to avoid a transfer. Defendant admits that the subject payment meets the first and second elements of a preferential transfer under § 547(b). (Defendant's Response to Plaintiff's Statement of Material Facts, ¶ 5, 6).

The third element of a preference requires that the transfer be made while the debtor was insolvent. 11 U.S.C. § 547(b)(3). Under § 547(f), debtor is presumed insolvent for the 90 days immediately preceding the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(f). Defendant has presented no evidence to establish an issue of material fact with regard to insolvency or to rebut this presumption.

■ Under the fourth element of a preference, the transfer must be made within 90 days of the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4). For purposes of § 547(b), a "transfer" of an ordinary check as defined by 11 U.S.C. § 101(54) occurs on the date of honor by the drawee bank. *Barnhill v. Johnson*, — U.S. —, —, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992). In the present case, the check for the subject payment was paid by debtor's bank on February 28, 1990, within 90 days of the May 25, 1990 filing of the bankruptcy petition.

■ The fifth element of a preference is that the transfer enables the creditor to receive more than it would receive if the estate were liquidated under Chapter 7 and the transfer had not been made. 11 U.S.C.

§ 547(b)(5). The test for this element was established by the Supreme Court in *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936). As construed in *Elliot v. Frontier Properties (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416 (9th Cir. 1986), whether a transfer is a preference:

... should be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." This analysis requires that in determining the amount that the transfer "enables [the] creditor to receive," such creditor must be charged with the value of what was transferred *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation. The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.

*Shurtleff*, 778 F.2d at 1421 (citations omitted); *see also Barash v. Public Fin. Corp.*, 658 F.2d 504, 508–09 (7th Cir.1981); *Tidwell v. AmSouth Bank (In re Cavalier Homes of Georgia, Inc.)*, 102 B.R. 878, 888 (Bankr. M.D.Ga.1989). Section 547(b)(5) codifies the ruling of *Palmer Clay Products*. 4 *Collier on Bankruptcy*, ¶ 547.08 (15th ed.1989).

In the present case, the total distribution to unsecured creditors under a Chapter 7 liquidation is estimated to be between five and ten percent. (Affidavit of Plaintiff, ¶ 4). This fact is undisputed by defendant. Thus,

---

1. Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between [90] days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

absent avoidance of the subject payment, the court finds that defendant has received more than it would receive in liquidation had the payment not been made.

■ Plaintiff has met his burden of proof for each element of a preference. Because there is no genuine issue of material fact in dispute, the court concludes as a matter of law that the subject payment is a preference. Plaintiff is entitled to avoid the subject payment unless defendant can show that the transfer falls under one of the exceptions in § 547(c). Defendant has the burden of proving by a preponderance of the evidence the nonavoidability of the transfer under § 547(c). *See* 11 U.S.C. § 547(g); *Kellman v. P.S.E. & G. (In re Jolly N, Inc.)*, 122 B.R. 897, 904 (Bankr.D.N.J.1991).

Defendant contends that the subject payment falls under the ordinary course of business exception of § 547(c)(2).[2] This section provides that a transfer may not be avoided:

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

A creditor attempting to satisfy § 547(c)(2) must prove all three elements of that subsection. *Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 243 (6th Cir.1992). *See also Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload, Inc., et al.)*, 152 B.R. 690, 691–92 (Bankr.N.D.Ga.1992) (Drake, J.); *Bonapfel v. Lubold (In re Family Home Sales Center, Inc.)*, 65 B.R. 176, 178 (Bankr.N.D.Ga.1986). Plaintiff does not dispute that debtor's indebtedness to defendant was incurred in the ordinary course of business as required by § 547(c)(2)(A). The dispute is whether defendant has established the last two requirements, § 547(c)(2)(B) and (C).

■ Under § 547(c)(2)(B), the court must make a subjective inquiry about whether the payment of a debt was made in the ordinary course of business of the debtor and the transferee. *See Fred Hawes*, 957 F.2d at 244. In making this determination, other courts have considered such factors as "the prior course of dealing between the parties, the amount of the payment, the timing of the payment, and the circumstances surrounding the payment." *Newton v. Ed's Supply Co. (In re White)*, 58 B.R. 266, 269 (Bankr. E.D.Tenn.1986); *See also Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989).

■ "Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception." *Craig Oil*, 785 F.2d at 1567; *see also Fred Hawes*, 957 F.2d at 244. Late payments are considered " 'ordinary' upon a showing that [they] were the normal course of business between the parties." *Fred Hawes*, 957 F.2d at 244. Accordingly, defendant must establish a " 'baseline' of dealings" so that the court may compare the practice of late payments during the preference period with the prior course of dealing. *See Iannacone v. Klement Sausage Co., Inc. (In re*

---

**2.** Defendant initially contends that this case is legally and factually controlled by this court's decision in *Ellenberg v. Tulip Production Polymerics, Inc. (In re T.B. Home Sewing Enterprises, Inc.)*, 173 B.R. 782 (Bankr.N.D.Ga.1993) (Cotton, J.). In *Tulip*, this court concluded that based on the evidence presented, Tulip Production Polymerics, Inc. ("Tulip") established the ordinary course of business exception with regard to the payments made by the debtor to Tulip during the preference period. *Tulip*, 173 B.R. at 790. Thus, defendant asserts that under the doctrine of collateral estoppel, the *Tulip* judgment precludes plaintiff from relitigating issues actually litigated in *Tulip*. Defendant misapprehends the application of collateral estoppel. The parties in the present case are not the same as the parties in the *Tulip* case. Plaintiff's claims against defendant do not arise out of the same operative facts as his claims against Tulip. While the issues of law in these cases may be similar, the underlying facts are not. As such, plaintiff was not afforded an opportunity to litigate his claims against defendant in the *Tulip* case. Thus, the doctrine of collateral estoppel is inapplicable, and defendant's contention is without merit.

*Hancock–Nelson Mercantile Co., Inc.*), 122 B.R. 1006, 1013 (Bankr.D.Minn.1991). This "baseline of dealings" must be:

> fixed at least in part during a time in which [debtor's] day-to day operations were 'ordinary' in the laymen's sense of the word. Preferably, the material period should extend back into the time before the debtor became financially distressed[.]

*Id.* at 1013.

■ In the present case, it is undisputed that the subject payment was made outside the invoice credit terms of 45 days. The subject payment was applied to eight invoices and was made from 90 to 103 days past the invoice date. Thus, payment for these invoices ranged from 45 to 58 days late. Defendant contends that such late payments were in the ordinary course of business of the parties. In support of this contention, Cathrine Bonds, defendant's credit manager for approximately 14 years, testified that debtor was historically a "slow paying customer" who was never in a current position with regard to its account. (Deposition of Cathrine Bonds ("Bonds Dep."), p. 30–33, 62, 67, 72). Ms. Bonds' statements regarding the late payments by debtor stand undisputed in the record.

In addition, the payment histories provided by the parties reflect a record of late payments by debtor to defendant. A review of the parties' payment history from February 26, 1988 to February 5, 1990, shows that debtor made payments to defendant on over 200 invoices with credit terms of 45 days.[3] (Bonds Dep., Defendant's Exhibit No. 1 and Plaintiff's Exhibit No. 6). Payments on virtually all of these invoices were late ranging from 55 to 286 days after the invoice date or 10 to 241 days late. There were two isolated exceptions in which debtor paid an invoice within the credit term of 45 days. Otherwise, the record reflects that debtor was consistently late with regard to making payment within the credit term of 45 days.

As mentioned above, the subject payment was made for eight invoices and ranged from 90 to 103 days past the invoice date or 45 to

58 days late. Consequently, it was made well within the range established by the parties during the pre-preference period. *See Jensen v. Raymond Building Supply Corp.* (*In re Homes of Port Charlotte Florida, Inc.*), 109 B.R. 489 (Bankr.M.D.Fla.1990). Thus, the undisputed testimony of Ms. Bonds taken together with the payment histories attached to her deposition establish a "baseline of dealings" regarding the practice of late payments. The subject payment, therefore, was made in accordance with and within the baseline of such practice.

■ Plaintiff alleges that the subject payment was made in response to defendant's collection efforts which included making telephone calls to debtor whenever its accounts were due. As such, plaintiff contends that the subject payment was not made in the ordinary course of business of the parties. "[W]henever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts." *Marathon Oil Co. v. Flatau* (*In re Craig Oil Co.*), 785 F.2d 1563, 1566 (11th Cir.1986). Payments made in response to unusual debt collection efforts by the creditor are considered outside the scope of the ordinary course of business exception. *Id.*

In her deposition, Ms. Bonds indicates that collection activities on debtor's past due account occurred in January of 1990. (Bonds Dep. at 36). Ms. Bonds testified that on January 3 and 4, 1990, she made two phone calls to Michael Rocker, debtor's former president, with regard to debtor's past due account. (Bonds Dep. at 36, 48; Plaintiff's Exhibit No. 7, p. 6). Ms. Bonds then stated that Mr. Rocker returned her phone calls to communicate that a check was being mailed on January 10, 1990, and that he would call back regarding a schedule for payment of the remainder of the past due account. (Bonds Dep. at 36). The evidence presented indicates that on January 18, 1990, Mr. Rocker called Ms. Bonds to make the following commitment:

---

**3.** In these payment histories, there were isolated instances in which the credit term was not 45 days.

[c]heck being sent for $43,361.00. This included rebate due to [debtor]. Sending two post dated checks. One check in the amount of $63,799.72 to be deposited [on February 28, 1990,] and one for $60,689.95 to be deposited [on February 5, 1990].

(Bonds Dep. at 37; Plaintiff's Exhibit No. 7 at 1).

In addition to telephone calls, plaintiff contends that defendant refused to ship new goods to debtor unless and until old invoices were paid. In her deposition, Ms. Bonds further states that on February, 14, 1990, defendant "released order number 286338 per [Ms. Bonds] ..., check-in-house for $63,-000." (Bonds Dep. at 70). This statement indicates that goods were released to debtor after receiving the subject payment to be deposited on February 28, 1990, and applied to old invoices. Thus, the undisputed evidence presented and identified by plaintiff establishes that defendant initiated collection activities and that the subject payment of $63,799.72 was made in response to such activities.

While admitting that it engaged in collection activities, defendant contends that such activities were "ordinary" and consistent with the normal course of business between the parties. Ms. Bonds testified that whenever it was revealed that a customer was past due, defendant would call the customer to determine when the payments were forthcoming. (Bonds Dep. at 46). She indicated that it was safe to assume that this policy was utilized with debtor. (Bonds Dep. at 46). She further stated that it was defendant's standard policy to hold orders until there had been a payment on some of the past due accounts or a commitment to pay a past due account. (Bonds Dep. at 51–52; 86). With regard to defendant's relationship with debtor, Ms. Bonds indicated that it was ordinary for defendant to hold debtor's checks, release goods to debtor, and then deposit the check. (Bonds Dep. at 52). Ms. Bonds summed up defendant's relationship with debtor by stating the following:

> [d]ebtor ... was always in a past due position. We released orders on a past due position, we held orders on a past due position. You can tell from the call infor-

mation, that we called them from time to time and that they called us from time to time, and that there [were] schedules for payments, and checks were received.

(Bonds Dep. at 60–61).

Because debtor was historically slow in making payment on its account, a "baseline of dealings" was established in which phone calls would be exchanged between the parties and goods would be withheld by defendant until debtor either paid or committed to pay some of the past due account. Even plaintiff admits that defendant had a history of utilizing such collection methods with debtor. (Plaintiff's Reply Brief to Defendant's Response to Plaintiff's Motion for Summary Judgment, p. 3). There was little, if any, deviation from this "baseline of dealing" with regard to debtor making the subject payment in response to the normal collection efforts of defendant. The Eleventh Circuit in *Craig Oil* requires evidence of "unusual" collection efforts with regard to the subject payment. In this case, there is no evidence of "unusual" collection efforts with regard to the subject payment. The undisputed evidence establishes that defendant's collection efforts with regard to the subject payment were within the normal course of business of the parties.

Plaintiff also contends that the subject payment was made as a result of economic coercion. In the present case, there is no dispute that debtor was a slow paying customer who was never current on its account. As such, it seems reasonable for defendant to hold goods until debtor either paid some of its invoices or committed to pay some of its invoices. In fact, "[i]t is hardly unusual for a creditor to urge its debtor to pay more promptly." *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 499 (8th Cir.1991). Moreover, there is no evidence presented to indicate that these collection activities increased in intensity with regard to the subject payment as compared to previous payments. Defendant neither demanded immediate payment of all of debtor's outstanding charges nor threatened to terminate its relationship with debtor to acquire the subject payment. To the extent that there was any economic inducement as a result of defendant's collec-

tion efforts, it is not the kind of economic pressure to remove the subject payment from the ordinary course of business exception. Thus, plaintiff's contention is without merit.

Plaintiff further contends that debtor's holding of the subject payment for deposit was not within the ordinary course of business of the parties. While the check for the subject payment was dated January 18, 1990, Mr. Rocker requested that it not be deposited by defendant until February 28, 1990. (Bonds Dep. at 23, 37; Plaintiff's Exhibit 7 at 1). In his affidavit, Mr. Rocker states that debtor did not "routinely request [defendant] not to deposit checks." (Affidavit of Michael Rocker, ¶ 8). With regard to holding checks, Ms. Bonds stated that "it was not unusual to get groups of checks [from defendant], either post dated or requested [sic] that those be deposited later." (Bonds Dep. at 64). As mentioned in two memorandums from debtor to defendant, dated September 30, 1989, and October 22, 1989, debtor enclosed several checks in payment of past invoices requesting that said checks be deposited at a later date. (Bonds Dep. at 65, Plaintiff's Exhibit Nos. 8 and 9). Ms. Bonds also indicated that other checks may have been held for defendant that were not recorded. She states that "[w]e do not record for any of our customers who do this on a frequent basis ... all the time when checks are held." (Bonds Dep. at 65).

Ms. Bonds testimony stands undisputed in the record and is not inconsistent with Mr. Rocker's statement in his affidavit. While not routinely holding checks for defendant, the undisputed evidence establishes that plaintiff held checks for defendant on several occasions prior to the preference period. As such, the undisputed evidence establishes that a practice of holding checks developed between the parties. Thus, defendant's holding of the subject payment for deposit on February 28, 1990, was not inconsistent with the parties' prior course of dealings and does not remove it from the ordinary course of business exception. The court concludes, therefore, that defendant has carried its burden in establishing that the subject payment was made in the ordinary course of business of debtor and defendant as required by § 547(c)(2)(B).

The court next must consider whether defendant has established that the subject payment was made according to ordinary business terms pursuant to § 547(c)(2)(C). In contrast to § 547(c)(2)(B), the court makes an objective inquiry under § 547(c)(2)(C) requiring "proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Fred Hawes*, 957 F.2d at 244. To establish this element, defendant has submitted the affidavits of Bobbye L. Adcock ("Adcock Aff.") and David A. Ladd ("Ladd Aff."). Ms. Adcock has been employed in credit and collections functions in the arts and crafts industry for 23 years, and Mr. Ladd has been familiar with the collection functions in the arts and crafts industry for approximately 20 years. (Adcock Aff., ¶ 1; Ladd Aff., ¶ 1). Both Ms. Adcock and Mr. Ladd have attended meetings, seminars, and workshops sponsored by various arts and crafts associations to study credit collection standards and trends. (Adcock Aff. at 2; Ladd Aff. at 2).

The Adcock affidavit and the Ladd affidavit establish that the subject payment is ordinary in relation to the standards prevailing in the relevant industry. In their affidavits, they state that in 1989 and 1990, "it was common in the arts and crafts material industry for customers to pay 60 days or more later than the stated credit terms on invoices." (Adcock Aff. at 3; Ladd Aff. at 3). Plaintiff admits that such late payments are within the common experience of vendors. (Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 10). In the present case, the subject payment ranged from 45 to 58 days late which is similar to payments made within the arts and crafts industry.

In addition, Ms. Adcock and Mr. Ladd state that "[w]ith respect to collecting accounts in the arts and crafts industry materials industry in 1989 and 1990, it was common practice among vendors to accept post-dated checks and to hold checks for deposit on a future date at the request of customers." (Adcock Aff. at 6; Ladd Aff. at 6). They further state that in 1989 and 1990, it was

common practice in the relevant industry for account holders to contact the delinquent accounts and to hold shipments on past due accounts. (Adcock Aff. at 4–5; Ladd Aff. at 4–5). Plaintiff admits these statements insofar as they relate to the common practices in the arts and crafts industry. (Plaintiff's Response to Defendant's Statement of Material Facts at 13–14).

Thus, the undisputed evidence establishes that the subject payment is ordinary in relation to the standards prevailing in the relevant arts and crafts industry. The court concludes, therefore, that defendant has carried its burden in establishing that the subject payment was made according to ordinary business terms as required by § 547(c)(2)(C).

For the foregoing reasons, the court concludes that the subject payment is a preference; that defendant has proven the ordinary course of business exception under § 547(c)(2); and that there is no genuine issue of material fact which precludes summary judgment. Therefore, plaintiff may not avoid and recover the preferential transfer in the amount of $57,098.77, and defendant is entitled to summary judgment. Accordingly, it is

**ORDERED** that defendant's motion for summary judgment is **granted** and plaintiff's motion for summary judgment is **denied.**

IT IS SO ORDERED.